# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**BYRON MCGRAW**,
Appellant,

v.

**STATE OF FLORIDA**,
Appellee.

No. 4D17-232

[March 21, 2018]

Appeal from the County Court for the Fifteenth Judicial Circuit, Palm Beach County; Leonard Hanser, Judge; L.T. Case No. 50-2016-CT-013594-AXXX-NB.

Carey Haughwout, Public Defender, and Benjamin Eisenberg, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Richard Valuntas, Assistant Attorney General, West Palm Beach, for appellee.

KUNTZ, J.

The Defendant appeals an order denying his motion to suppress the results of a warrantless blood draw in a DUI case. The county court found the blood draw was an unconstitutional search under the Fourth Amendment, but denied the motion to suppress based on the "good faith" exception to the warrant requirement. The county court also certified the following question to be of great public importance:

Does the following sentence in § 316.1932(1)(c), Florida Statutes,

Any person who is incapable of refusal by reason of unconsciousness or other mental or physical condition is deemed not to have withdrawn his or her consent to such [blood] test.

remain constitutionally valid under the Fourth Amendment to the United States Constitution and Article 1, Section 12 of the

Florida Constitution in light of *Missouri v. McNeely*, [569 U.S. 141] (2013), *State v. Liles*, 191 So. 3d 484 (Fla. 5th DCA 2016), and *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016)?

We exercised our discretionary jurisdiction under Florida Rule of Appellate Procedure 9.030(b)(4)(A) to answer the certified question.

We address the case before us, and the certified question, in multiple parts. First, we discuss the facts relevant to this appeal. Second, we discuss the Defendant's motion to suppress and the court's ruling. Third, we discuss Florida's implied consent law. Fourth, we analyze the Supreme Court's decisions in *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016), and decisions from courts around the country that have traveled this same path. Fifth, we apply the Supreme Court's decisions in *McNeely* and *Birchfield* to the case before us.

In applying the Supreme Court's decisions, we rephrase the certified question:

> Under the Fourth Amendment, may a warrantless blood draw of an unconscious person, incapable of giving actual consent, be pursuant to section 316.1932(1)(c), Florida Statutes (2016) ("Any person who is incapable of refusal by reason of unconsciousness or other mental or physical condition is deemed not to have withdrawn his or her consent to [a blood draw and testing].), so that an unconscious defendant can be said to have "consented" to the blood draw?

We answer the rephrased certified question in the affirmative, and affirm the county court's denial of the Defendant's motion to suppress.

### *Background*

### i. **The Accident and Investigation**

The Defendant was involved in a single car rollover accident, causing damage to his vehicle and injury to himself. An officer assigned to the special operations division of the Riviera Beach Police Department arrived at the scene around 8:00 a.m. When he arrived, officers had established a crash site, and Riviera Beach Fire Rescue was "cutting away at portions of the vehicle" trying to extricate the Defendant.

The officer testified that the Defendant was unconscious and unresponsive to Fire Rescue. While standing "two to three feet behind the Fire Rescue personnel" he could detect the odor of alcohol from the Defendant, his clothing, and the vehicle.

Fire Rescue removed the Defendant from the vehicle and transported him to the emergency room. The officer followed the ambulance to the hospital, a trip that took around five minutes. At the hospital, the officer again made contact with the Defendant, who remained unconscious. The officer testified that after the medical professionals completed treating the Defendant, they brought the Defendant into a room and placed in "some sort of device that was actually just keeping his head still and straight at that time." The officer observed bruises and scratches, but observed no traumatic injuries to his body.

The officer testified that, at this point, he was investigating a possible driving under the influence case and "wanted to request . . . a sample of his blood." The officer "attempted to rub [the defendant's] sternum to see if there would be any kind of reaction from pain compliance. And the registered nurse who was assisting [the officer] also conducted a sternum rub, to which we had no effects at all." At that time, the officer requested that the registered nurse assigned to the Defendant draw his blood. After they drew his blood, and about thirty to sixty minutes after arriving at the hospital, the officer left the hospital and had no further contact with the Defendant or the hospital about the Defendant.

## ii. The Defendant's Motion to Suppress

The State later charged the Defendant by amended information with two counts of driving under the influence causing or contributing to injury to persons or property (enhanced). Arguing "the U.S. Supreme Court [recently] held that warrantless blood draws are not permissible incident to arrest, and are not per se permissible under the exigent circumstances exception," the Defendant moved to suppress the blood draw.

The court held a hearing on the Defendant's motion to suppress, hearing testimony from the officer, and subsequently rendered an order denying the motion to suppress and certifying a question of great public importance. The court held Florida's implied consent law does not provide consent for a warrantless blood draw. The court then found the officer's testimony supported no other exception to the warrant requirement. Finally, the court found that the officer proceeded in an objectively reasonable reliance on the validity of the implied consent law. As a result of the officer's good faith reliance on a presumptively valid statute, the

3

court denied the motion to suppress.  The Defendant was convicted, and appeals the court's ruling.

### *Analysis*

"We review motions to suppress under a mixed standard, deferring to the trial court's factual findings but reviewing legal conclusions *de novo*." *Strachan v. State*, 199 So. 3d 1022, 1024 (Fla. 4th DCA 2016).  And, the constitutionality of a statute presents a pure question of law subject to *de novo* review.  *Braddy v. State*, 219 So. 3d 803, 819 (Fla. 2017).

### i.  Florida's Implied Consent Law

The Fourth Amendment to the United States Constitution protects "persons, houses, papers and effects against unreasonable searches." Amend. IV, U.S. Const.  In Florida, we construe this right "in conformity with [and] as interpreted by the United States Supreme Court."  Art. I, § 12, Fla. Const.  In other words, "the search and seizure provision of the Florida Constitution imposes no higher standard than that of the Fourth Amendment to the United States Constitution."  *State v. Hetland*, 366 So. 2d 831, 836 (Fla. 2d DCA 1979).

The Defendant argues that the blood draw violated his Fourth Amendment rights.  First, we begin with the premise that the "compulsory administration of a blood test . . . plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." *Schmerber v. California*, 384 U.S. 757, 767 (1966).  In other words, a blood draw is a "search" under the Fourth Amendment.  Therefore, the Defendant is initially correct that, to compel a blood draw, the State must either: (a) obtain a warrant; or (b) establish a valid exception to the warrant requirement.  It is undisputed that the State did not obtain a warrant. Rather, the State relies on an exception to the warrant requirement — namely, the Defendant's consent based on Florida's implied consent law.

"All 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood alcohol content] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." *McNeely*, 569 U.S. at 161.

Generally, our implied consent law is codified in chapter 316, Florida Statutes.  *See* §§ 316.1932, .1933, .1934, Fla. Stat. (2015).  These statutes "essentially require all persons accepting a license to drive in Florida to consent to a blood-alcohol test upon being arrested for driving under the

influence." *Montes-Valeton v. State*, 216 So. 3d 475, 481 n.1 (Fla. 2017) (quotation omitted).

Specifically at issue here is section 316.1932(1)(c):

> Any person who accepts the privilege extended by the laws of this state of operating a motor vehicle within this state is, by operating such vehicle, deemed to have given his or her consent to submit to an approved blood test for the purpose of determining the alcoholic content of the blood . . . . Any person who is incapable of refusal by reason of unconsciousness or other mental or physical condition is deemed not to have withdrawn his or her consent to [a blood draw and testing].

The Defendant argues this statute is insufficient, by itself, to satisfy the Fourth Amendment. Further, he argues it is unconstitutional "to the degree it provides involuntary implied consent to perform a blood draw any time a person suspected of driving under the influence is unconscious at a hospital — this is because implied consent is not the same as consent for Fourth Amendment purposes."

In addition to recent United States Supreme Court decisions, the Defendant cites two Florida decisions in support of his position. *See Liles*, 191 So. 3d at 486; *Williams v. State*, 167 So. 3d 483, 488 (Fla. 5th DCA 2015), *vacated*, No. SC15-1417, 2016 WL 6637817 (Fla. Nov. 9, 2016).[1] While we can certainly look to the decisions of our sister court, we first consider decisions from the United States Supreme Court, as, again, Florida provides no Fourth Amendment protection beyond that determined by the Supreme Court.

### ii. The Supreme Court's Decisions in *McNeely* and *Birchfield*

Two recent United States Supreme Court cases control our resolution of this case.

---

[1] The Florida Supreme Court vacated the Fifth District's decision for reconsideration in light of the Supreme Court's issuance of *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016). On remand, the Fifth District found its "task significantly easier" and concluded "that breath-alcohol tests are permissible under the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement." *Williams v. State*, 210 So. 3d 774, 776 (Fla. 5th DCA 2017).

First, in *Missouri v. McNeely*, 569 U.S. 141 (2013), the defendant was stopped by a Missouri police officer and declined to use a portable breath-test device to measure his blood alcohol level. *Id.* at 145. The officer arrested him, and took him to a local hospital for blood testing. *Id.* He moved to suppress the blood test, arguing the compelled taking of his blood without a warrant violated the Fourth Amendment. *Id.* at 146. The trial court granted his motion, and the Missouri Supreme Court affirmed. The United States Supreme Court granted certiorari to determine "whether the natural metabolization of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *Id.* at 145. Justice Sotomayor, writing for a fractured majority,[2] rejected Missouri's argument for a per se exception to the warrant requirement in DUI investigations based on exigent circumstances. *Id.* The Court held that "that exigency in this context must be determined case by case based on the totality of the circumstances." *Id.*

Three years after *McNeely*, and after the accident at issue here, the Supreme Court issued *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016). *Birchfield* involved three consolidated cases, two arising from North Dakota and a third from Minnesota. Danny Birchfield accidentally drove his car off a North Dakota highway, and later refused to consent to a blood draw. *Id.* at 2170–71. William Robert Bernard, Jr. had gotten a truck stuck in a river at a boat ramp in Minnesota, and refused to allow an officer to give him a breath test. *Id.* at 2171. An officer saw the third petitioner, Steve Michael Beylund, unsuccessfully try to turn into a driveway. Unlike Birchfield and Bernard, Beylund consented to a blood draw at a nearby

---

[2] Justices Scalia, Ginsburg, Kennedy, and Kagan joined Parts I, II-A, II-B, and IV of Justice Sotomayor's opinion. Justices Scalia, Ginsburg, and Kagan joined Parts II-C and III of Justice Sotomayor's opinion. Justice Kennedy wrote a separate concurring opinion, explaining his view that the case did not require an analysis of the issues discussed in Parts II-C and III of Justice Sotomayor's opinion. The Chief Justice wrote a separate opinion, joined by Justices Breyer and Alito, concurring in the Court's conclusion that the totality of the circumstances should govern a Fourth Amendment inquiry. Yet the Chief Justice dissented from the majority opinion based on his view that, in the context of DUI investigations, "proper rule is straightforward." The Chief Justice would require a warrant when there was sufficient time for the officer to obtain one but, otherwise, would find the dissipation of the alcohol in the blood stream presents a sufficient exigent circumstance to provide an exception to the warrant requirement. Finally, Justice Thomas filed a separate dissenting opinion to explain his view that the dissipation of alcohol in the blood stream constitutes an exigent circumstance and, as a result, a warrantless blood draw does not violate the Fourth Amendment.

hospital after the officer read him North Dakota's implied consent warning. *Id.* at 2171–72.

The issue before the Supreme Court was "whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream." *Id.* at 2172. The Court first reviewed its Fourth Amendment jurisprudence in the context of DUI cases; more specifically in the context of the search-incident-to-arrest doctrine. *Id.* at 2173–76. As with searches of cell phones and DUI investigations, the situation before the Court could not have been envisioned in the founding era. Therefore, the Court applied a balancing test to determine "whether to exempt a given type of search from the warrant requirement by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 2176 (internal citation omitted).

Examining the effect of breath tests and blood tests on an individual's privacy interests, the Court reaffirmed its earlier conclusion that a breath test does not implicate significant privacy concerns. *Id.* (citing *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616–17 (1989)). It noted that the results of a breath test capture only limited information — the amount of alcohol in a defendant's breath; and participation in a breath test is not an experience likely to enhance any embarrassment to the defendant. *Id.* at 2177.

Blood tests, the Court found, "are a different matter." *Id.* at 2178. Blood tests pierce the skin and are far more intrusive than a breath test. And, the Court explained, a blood test "places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading." *Id.* at 2178.

After determining the scope of the privacy interest, the Court turned to the states' asserted need to obtain blood alcohol readings. *Id.* On that issue, there is no doubt the states have a legitimate interest in ensuring the safety of the roads. *Id.* The Court rejected the dissent's argument that "an officer making an arrest for drunk driving should not be allowed to administer a BAC test unless the officer procures a search warrant or could not do so in time to obtain usable test results." *Id.* at 2179. This argument contravened their "decisions holding that the legality of a search incident to arrest must be judged on the basis of categorical rules." *Id.* Further, "requiring the police to obtain a warrant in every case would

impose a substantial burden but no commensurate benefit." *Id.* at 2181–82.

The Court then turned to the constitutionality of warrantless breath and blood tests. As for breath tests, the Court found "that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving. The impact of breath tests on privacy is slight, and the need for BAC testing is great." *Id.* at 2184. The Court reached a different answer about blood tests, stating "[b]lood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test. Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant." *Id.*

Although not relevant to any of the three petitioners in *Birchfield*, but relevant to our case, the Court commented on blood draws of unconscious drivers:

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

*Id.* at 2184–85.

On first read, this statement appears to support Judge Gross's conclusion that Florida's implied consent law is unconstitutional as it applies to unconscious drivers. But *Birchfield* actually reaffirmed the constitutionality of implied consent laws, stating its "prior opinions have referred approvingly to the general concept of implied consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Id.* at 2185. Despite other conclusions in the opinion, the Court specifically stated that "nothing we say here should be read to cast doubt on them." *Id.*

Nevertheless, implied consent laws did not escape unscathed. Instead, the Court stated that "[i]t is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test." *Id.* We now turn to this analysis.

8

### iii. *Birchfield* and *McNeely* Do Not Render Florida's Implied Consent Law Unconstitutional

The Defendant and the concurrence both believe *Birchfield* and *McNeely* render our implied consent law unconstitutional. We disagree.

In fact, it is on that issue — the continued constitutionality of certain implied consent laws — on which we resolve this case. After noting that all fifty states have enacted some form of implied consent laws, *Birchfield* held that implied consent laws that do not impose criminal penalties are constitutionally valid. If no implied consent law could survive the Fourth Amendment, the Court would have stated as much. There was no reason for the Supreme Court to separately categorize implied consent laws imposing criminal penalties from those imposing administrative and evidentiary penalties, if both categories fail to satisfy the Fourth Amendment. Instead, we are comfortable concluding the Court did so to excise those that impose criminal penalties from constitutional protection, while leaving those that merely impose administrative or evidentiary penalties. Because Florida's implied consent law falls in the latter category, it remains constitutionally valid.

Additionally, the Supreme Court held that the reasonableness of blood tests "must be judged in light of the availability of the less intrusive alternative of a breath test." *Birchfield*, 136 S. Ct. at 2184. When an officer is investigating an unconscious defendant, a breath test is not an alternative. As such, the effectiveness of the breath test that an officer may give to a conscious defendant is not relevant to an unconscious defendant.

Interpreting *Birchfield* is a path well-traveled. In a number of these cases the defendant, like the Defendant here, was unconscious. *See, e.g.*, *State v. Speelman*, No. L-16-1295, 2017 WL 6628527 (Ohio Ct. App. Dec. 29, 2017); *Commonwealth v. Myers*, 164 A.3d 1162 (Pa. 2017); *State v. Dalton*, No. 2016AP2483-CR, 2017 WL 3078331 (Wis. Ct. App.), *review granted*, 905 N.W.2d 840 (Wis. 2017); *State v. Romano*, 800 S.E.2d 644 (N.C. 2017); *People v. Hyde*, 393 P.3d 962 (Colo. 2017); *State v. Havatone*, 389 P.3d 1251 (Ariz. 2017).

In other cases, the defendant was conscious. *See, e.g.*, *State v. Hi Ta Lar*, No. 27951, 2018 WL 1003786 (S.D. Feb. 21, 2018); *Vondrachek v. Comm'r of Pub. Safety*, 906 N.W.2d 262 (Minn. Ct. App. 2017); *Olevik v. State*, 806 S.E.2d 505 (Ga. 2017); *State v. Vargas*, 404 P.3d 416 (N.M. 2017); *State v. Hoerle*, 901 N.W.2d 327 (Neb. 2017); *State v. Ryce*, 396 P.3d 711 (Kan. 2017); *State v. Pettijohn*, 899 N.W.2d 1 (Iowa 2017); *State v.*

*Boyd*, 156 A.3d 748 (Me. 2017); *Wolfe v. Commonwealth*, 793 S.E.2d 811 (Va. Ct. App. 2016); *State v. Reynolds*, 504 S.W.3d 283 (Tenn. 2016); *State v. Charlson*, 377 P.3d 1073 (Idaho 2016).

Of these opinions, we find the Colorado Supreme Court's opinion most persuasive. In *Hyde*, the defendant drove his pickup truck into a light pole rendering him unconscious. 393 P.3d at 964. An officer took the defendant to a local hospital and, under Colorado's implied consent law, directed the hospital to draw the defendant's blood to establish his blood alcohol level. *Id.* The defendant's motion to suppress was granted by the trial court, based on his argument that the blood draw was unconstitutional. *Id.*

The Colorado Supreme Court recognized that "the *McNeely* plurality underscored the utility of implied consent laws such as Colorado's Expressed Consent Statute." *Id.* at 968 (citing *McNeely*, 569 U.S. at 156–57). Further, the court recognized that *Birchfield* reaffirmed the Supreme Court's approval of implied consent laws. *Id.* at 968 (citing *Birchfield*, 136 S. Ct. at 2185). As we do, the Colorado Supreme Court recognized that the United States Supreme Court's approval of implied consent laws was not without limitation, but determined the limitations are not applicable to the Colorado law:

> True, the Court's approval extended only to implied consent laws that impose civil penalties if a driver refuses to take a blood test; the Court considered laws that impose criminal penalties on a driver's refusal to be going a step too far. But Colorado's Expressed Consent Statute falls into the former category — the Statute imposes only civil, and not criminal, penalties on drivers who refuse to submit to a blood test. *Birchfield* therefore sanctions the warrantless blood draw that was conducted here on the basis of statutory consent.

*Id.* at 968 (internal citation omitted). Based on this interpretation, the Colorado Supreme Court found that "[b]y driving in Colorado, Hyde consented to the terms of the Expressed Consent Statute, including its requirement that he submit to blood-alcohol testing under the circumstances present here." *Id.* at 969. That consent "satisfied the consent exception to the Fourth Amendment warrant requirement" and "the blood draw was constitutional." *Id.*

Justice Eid wrote a persuasive opinion concurring in the court's judgment, explaining that "[t]he Court in *Birchfield* reasoned that traditional implied consent laws like Colorado's — namely, laws that deem

a person to have consented to BAC testing by virtue of driving, with administrative and evidentiary consequences for refusal to test — are reasonable under the Fourth Amendment." *Id.* at 971. Justice Eid analogized another Supreme Court case, *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978), a case involving implied consent in a heavily regulated industry. *Id.* at 971–72. In that case, the question presented "was whether implied consent could justify an OSHA search of a plumbing business." *Id.* at 972 (citing *Marshall*, 436 U.S. at 313). Justice Eid explained that the "Court recognized that '[t]he businessman in a regulated industry in effect consents to the restrictions placed upon him.'" *Id.*

In her view, *Marshall* and *Birchfield* "looked at the overall statutory regime in which the search was to take place, not the individual facts at the time the search was conducted, to determine whether implied consent would apply." *Id.* at 972. As a result, Justice Eid concluded, consent can be inferred from context and "[d]riving on the roads and being engaged in a highly regulated industry are two such contexts from which consent can be inferred." *Id.* And, in light of *Birchfield*, the defendant's consent is implied from the context of driving. *Id.*; *see also State v. Howes*, 893 N.W.2d 812, 834 (Wis. 2017) (Gableman, J., concurring) ("Far from disapproving the concept of consent by conduct within the context of a driver's implied consent, the Court [in *Birchfield*] expressly endorsed the general validity of state implied consent laws that infer motorists' consent to testing from the conduct of driving.").

The Virginia Court of Appeals agreed, concluding that *Birchfield* "has not implicated the constitutional validity of Virginia's implied consent statute as it relates to civil penalties for refusing a blood alcohol test." *Wolfe*, 793 S.E.2d at 814. That court relied on the same distinction in *Birchfield* that we do, recognizing that "the Court referred approvingly to the general concept of implied consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply [but] drew a distinction between statutes that impose civil penalties and those that impose criminal penalties." *Id.*

Also relying on the *Birchfield* distinction is the Minnesota Court of Appeals, which noted that, in *Birchfield*, all three of the "challenged laws *criminalized* the refusal to submit to post-arrest testing." *Vondrachek*, 906 N.W.2d at 271 (emphasis in original). But, it noted, *Birchfield* "expressly exempted" implied consent laws that do not criminalize the refusal to submit to a test. *Id.* Thus, because the Minnesota law at issue did not criminalize a refusal to submit to a test, it survived *Birchfield*. *Id.* Similarly, the Idaho Supreme Court upheld the denial of a motion to suppress, concluding that the defendant "gave his implied consent to

11

having his blood drawn by virtue of Idaho's implied consent statute." *Charlson*, 377 P.3d at 1080.

We recognize that not all courts addressing this issue after *Birchfield* have reached the same conclusion. Yet many of those decisions turn on the specifics of the implied consent law at issue. For example, even though the North Carolina Supreme Court has rejected the implied consent law as an exception to the warrant requirement, in that case, the state conceded the statute was unconstitutional. *Romano*, 800 S.E.2d at 648, 653 ("To be sure, the implied consent statute, as well as a person's decision to drive on public roads, are factors to consider when analyzing whether a suspect has consented to a blood draw, but the statute alone does not create a per se exception to the warrant requirement.").

The Arizona Supreme Court concluded that the unconscious clause in Arizona's statute "can be constitutionally applied only when case-specific exigent circumstances prevent law enforcement officers from obtaining a warrant." *Havatone*, 389 P.3d at 1255. But, the court also held that "[w]here police have probable cause to believe a suspect committed a DUI, a nonconsensual blood draw from an unconscious person is constitutionally permissible if, under the totality of the circumstances, law enforcement officials reasonably determine that they cannot obtain a warrant without significant delay that would undermine the effectiveness of the testing." *Id.*

Finally, we briefly discuss the two Florida decisions upon which the Defendant relies. Neither *Liles* nor *Williams* directly address the issue here: whether the State may compel a blood draw from an unconscious defendant based on Florida's implied consent law.

In *Liles*, and relevant here, the state relied on a different, but similar, implied consent law as the basis for compelling a blood draw. 191 So. 3d at 487. But the defendant in *Liles* explicitly withdrew his consent before the blood was drawn. *Id.* ("[E]ven if we agree . . . [the defendants] impliedly consented to the blood draws by driving, they explicitly revoked that consent when they refused to submit to the blood draws.").

We agree with *Liles*'s conclusion that when a defendant specifically withdraws his or her consent, the state cannot compel a blood draw. In that situation, the State would not be able to rely on implied consent as an exception to the warrant requirement; and the defendant would be subject to the administrative and evidentiary penalties provided by the implied consent law (and approved of in *Birchfield*).

12

The other case, *Williams*, is also unhelpful. As noted above, the decision cited by the Defendant was vacated by the Florida Supreme Court. On remand, the court held: "*Birchfield* has made our task significantly easier. Under the Florida Constitution, our Fourth Amendment jurisprudence is governed by decisions of the United States Supreme Court. Thus, we adopt the holding in *Birchfield* that breath-alcohol tests are permissible under the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement." *Williams*, 210 So. 3d at 775–76 (internal citation omitted). We also agree with the ultimate holding in *Williams*, that the State may compel a breath-alcohol test of a driver suspected of driving under the influence.

### *Conclusion*

The distinction between implied consent laws which impose criminal penalties for non-compliance and those which impose administrative or evidentiary penalties for non-compliance is important. The United States Supreme Court has determined only the former violates the Fourth Amendment. If the Court intended both categories of implied consent laws to suffer the same fate, it would have said so. Because Florida's law does not impose criminal penalties, the statute does not violate the Fourth Amendment. And, with an unconscious defendant, the "less intrusive alternative of a breath test" is not available. In effect, the blood test is the only option.

As a result, we need not address the Defendant's argument that the court erred in applying the good faith exception to the warrant requirement. The good faith exception is inapplicable when the search itself did not violate the Fourth Amendment. However, if required to reach it, we would agree with Judge Gross's opinion dissenting in part and concurring in part, and we would affirm the court's application of the good faith exception.

The court's denial of the Defendant's motion to suppress is affirmed for the reasons stated in this opinion.

*Affirmed.*

GERBER, C.J., concurs.
GROSS, J., dissents in part and concurs in part, with opinion.

GROSS, J., dissenting in part, concurring in part.

I dissent from the majority's determination of the constitutionality of section 316.1932(1)(c). The majority has applied a backward-looking jurisprudence contrary to the Fourth Amendment policy established by the Florida Supreme Court under Article I, Section 12 of the Florida Constitution. That policy is to move in the direction of the constitutional winds set in motion by the United States Supreme Court, not to wait for explicit direction from Washington on how to rule.

This policy is demonstrated by *Jardines v. State*, 73 So. 3d 34 (Fla. 2011), *aff'd*, 569 U.S. 1 (2013) and *Tracey v. State,* 152 So. 3d 504 (Fla. 2014). In *Jardines*, the Florida Supreme Court held that a dog sniff at a private residence was a search under the Fourth Amendment, requiring probable cause. 73 So. 3d at 55-56. Not until the United States Supreme Court affirmed *Jardines* in 2013 did that court expressly rule on whether a warrantless dog sniff search on the porch of a private residence was a search within the meaning of the Fourth Amendment. 569 U.S. at 11-12. In *Tracey*, the Florida Supreme Court held that police officers' use of cell site location information to track a defendant on public roads was a search falling under the Fourth Amendment. 152 So. 3d at 525-26. The United States Supreme Court will confront that issue this term. *See Carpenter v. United States,* No. 16-402 (argued Nov. 29, 2017).

This case is factually well-developed and the direction of the constitutional law is clear. To paraphrase a Nobel Laureate, you don't need to be a weatherman to know which way the legal wind blows.[3]

We should find the statute unconstitutional but affirm the county court because the officer acted in good faith in ordering the blood draw.

---

[3]  Walk on your tiptoes
Don't try "No-Doz"
Better stay away from those
That carry around a fire hose
Keep a clean nose
Watch the plain clothes
You don't need a weatherman
To know which way the wind blows

Bob Dylan, Subterranean Homesick Blues, BOB DYLAN, https://bobdylan.com/songs/subterranean-homesick-blues/ (last visited Feb. 21, 2018).

## *Introduction and Background*

Byron McGraw appeals an order denying his motion to suppress the results of a warrantless blood draw in a DUI case. The Palm Beach County Court denied the motion to suppress and certified the following question to be of great public importance:

> Does the following sentence in § 316.1932(1)(c), Florida Statutes,
>
>> Any person who is incapable of refusal by reason of unconsciousness or other mental or physical condition is deemed not to have withdrawn his or her consent to such [blood] test.
>
> remain constitutionally valid under the Fourth Amendment to the United States Constitution and Article 1, Section 12 of the Florida Constitution in light of *Missouri v. McNeely*, 569 U.S. 141 (2013), *State v. Liles*, 191 So. 3d 484 (Fla. 5th DCA 2016), and *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016)?

We should answer the certified question in the negative, holding that, under the Fourth Amendment, a blood draw of an unconscious person, incapable of giving consent, must be done pursuant to a warrant or to a recognized exception to the warrant requirement, such as exigent circumstances; a statutorily created consent "implied" by the act of driving on Florida roads does not satisfy the Fourth Amendment, so an unconscious defendant cannot be said to have "consented" to the blood draw.

Nonetheless, I agree to affirm the trial court's denial of the motion to suppress based on the good faith exception to the exclusionary rule, because the officer requesting the blood draw made an objectively reasonable mistake of law. *See Heien v. North Carolina,* 135 S. Ct. 530 (2014).

McGraw was charged with two counts of driving under the influence causing or contributing to injury to person or property. The evidence of his impairment came from a warrantless blood draw performed pursuant to section 316.1932(1)(c), Florida Statutes (2016), while he was unconscious at the hospital. Section 316.1932(1)(c), which is part of Florida's implied consent statutory scheme, provides in relevant part:

15

> Any person who accepts the privilege extended by the laws of this state of operating a motor vehicle within this state is, by operating such vehicle, deemed to have given his or her consent to submit to an approved blood test for the purpose of determining the alcoholic content of the blood . . . . Any person who is incapable of refusal by reason of unconsciousness or other mental or physical condition is deemed not to have withdrawn his or her consent to such test.

*Id.*

McGraw moved to suppress the results of the warrantless blood draw as a "violation of his rights under the Fourth and Fourteenth Amendment[s] to the United States Constitution, and Article I, Section 12 of the Florida Constitution." Relying upon *Birchfield*, 136 S. Ct. at 2160, and *McNeely*, 569 U.S. at 141, he contended the blood draw was unlawful because "warrantless blood draws are not permissible incident to arrest, and are not *per se* permissible under the exigent circumstances exception." McGraw argued there were no exigent circumstances that justified the warrantless blood draw and that the "police made no efforts to get a warrant for [his] blood," despite the ability to do so.

After a motion to suppress hearing, Judge Hanser made the following findings of fact which are supported by the record:

> 2. On April 16, 2016, at approximately 8:00 a.m., Officer De Santis of the Riviera Beach Police Department responded to a one-car accident . . . . Fire-Rescue was extricating Defendant from his vehicle when Officer De Santis arrived. Defendant's car had rolled over and was lying on its roof on the highway.
>
> 3. Defendant was the only person in the vehicle. Defendant was unconscious and unresponsive when Officer De Santis arrived and while he was being extricated from the vehicle. The officer stood close behind the Fire-Rescue crew as it worked to free Defendant from the vehicle and he noticed the odor of alcohol emanating from Defendant's skin, mouth and clothes.
>
> 4. Fire-Rescue transported Defendant to St. Mary's Hospital Emergency Room as a trauma alert patient.
>
> 5. Officer De Santis went to St. Mary's Hospital, a travel time of five to six minutes.

6. Defendant was unconscious when Officer De Santis arrived at the hospital. Defendant remained unconscious during the entire time the officer had contact with Defendant, a total time of not more than one hour, including time at the scene of the accident and at the hospital.

7. Defendant was lying with a neck brace on in the emergency room but he had no apparent "traumatic injuries"; bumps and bruises were present.

8. Attempts to revive Defendant using a sternum rub were unsuccessful and Officer De Santis did not communicate with Defendant at any time.

9. Officer De Santis requested that hospital personnel take a blood draw of Defendant. He provided the blood draw kit used by hospital personnel to obtain the draw.

10. During cross-examination, Officer De Santis stated the length of time of Defendant's stay at the hospital did not influence his decision to obtain the blood draw. The officer did not know when Defendant might be discharged from the hospital. . . . [T]he officer did not determine whether it would be impossible or impracticable to have Defendant submit to a breath test. He did not attempt to obtain a search warrant prior to taking the blood draw.

In a thoughtful order, Judge Hanser wrote that because section 316.1932(1)(c) did "not provide consent as required under the Fourth Amendment for a blood draw, based on recent constitutional jurisprudence," McGraw did not consent to a blood draw. The court identified the facts that led to its conclusion:

Defendant remained unconscious during the entire time Officer De Santis had contact with him, making common law voluntary consent impossible to obtain. Had it been possible to communicate with Defendant, Defendant would have had the opportunity to decide whether he would provide a blood sample or not, his refusal then requiring the officer to inform Defendant of implied consent. Properly informed of implied consent, Defendant would have been able to weigh the potential consequences of providing the blood sample against the real consequences of refusing.

(Footnote omitted).

The trial court also found that no exigent circumstances existed, stating that "[t]he total time the officer spent with Defendant was no more than one hour, from the time the officer arrived on scene, went to the hospital where Defendant had been taken, had the blood drawn, and left the hospital," and that "[t]he officer made no attempt to obtain a warrant for the blood draw."

Notwithstanding these conclusions, the trial court denied Defendant's motion to suppress based on the "good faith" exception to the exclusionary rule, finding that "it was reasonable for Officer De Santis to have a good faith belief in the constitutional validity of a warrantless blood draw authorized by section 316.1932(1)(c), Florida Statutes, under the circumstances [presented]."

### *Warrantless Blood Draws and Implied Consent*

The Fourth Amendment to the United States Constitution and Article I, Section 12 of the Florida Constitution enshrine the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." Amend. IV, U.S. Const.; Art. I, § 12, Fla. Const. The Florida Constitution requires section 12 to "be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const.

"A blood draw conducted at the direction of the police is a search and seizure under the Fourth Amendment." *Liles*, 191 So. 3d at 486 (citing *Schmerber v. California*, 384 U.S. 757, 767 (1966)). "To comply with the Fourth Amendment, law enforcement officers must obtain a warrant or consent for a blood draw, or there must be some other exception to the warrant requirement." *Id.* at 486. "When, as here, no warrant is obtained, '[t]he state has the burden to prove that an exception to the warrant requirement applies.'" *Id.* (quoting *Kilburn v. State*, 54 So. 3d 625, 627 (Fla. 1st DCA 2011)).

There are five recognized exceptions to the warrant requirement: (1) consent; (2) search incident to a lawful arrest; (3) probable cause to search but with exigent circumstances; (4) hot pursuit; and (5) stop and frisk. *Reed v. State*, 944 So. 2d 1054, 1058 (Fla. 4th DCA 2006). The exception pertinent to this case is consent.

18

It is undisputed that McGraw did not explicitly consent to the warrantless blood draw at the hospital, as he was unconscious at the time. However, the State contends that Defendant's consent was implied pursuant to section 316.1932(1)(c), and his consent was not withdrawn due to his unconsciousness.

Two recent cases of the United States Supreme Court have solidified and expanded the Fourth Amendment protection applicable to breath and blood tests incident to investigations of alcohol-related driving offenses.

In *McNeely*, the Court clarified that the natural metabolization of alcohol in the bloodstream is not "a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." 569 U.S. at 145. The court held that the existence of exigent circumstances "must be determined case by case based on the totality of the circumstances." *Id.* Focusing on nonconsensual blood testing, a plurality of the Court wrote that it was "aware of no evidence indicating that restrictions on nonconsensual blood testing have compromised drunk-driving enforcement efforts in the States that have them." *Id.* at 162. The plurality noted that "state restrictions on nonconsensual blood testing provide further support for our recognition that compelled blood draws implicate a significant privacy interest." *Id.*

The Supreme Court elaborated on the "significant privacy interest" in compelled blood draws in *Birchfield*, 136 S. Ct. at 2160. Unlike breath tests, blood tests "implicat[e] significant privacy concerns." *Id.* at 2178 (quoting *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 626 (1989)). "They 'require piercing the skin' and extract[ing] a part of the subject's body." *Id.* at 2178 (quoting *Skinner*, 489 U.S. at 625). "In addition, a blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple [blood alcohol] reading." *Id.*

In differentiating blood tests from breath tests, the Supreme Court suggested that, for an unconscious defendant, the preferred method of obtaining blood is through a warrant:

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in

> drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

*Id.* at 2184-85.

The Supreme Court in *Birchfield* then discussed the consent exception to the warrant requirement and "implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Id.* at 2185. The Court cited to a consent to search case where the consent was the product of a conscious mind and, based on the totality of the circumstances, was voluntarily given and not the result of duress or coercion, express or implied. *Id.* (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 248-49 (1973)).

The Court next referred to two cases imposing Fourth Amendment limitations on the extent to which consent may be inferred from "context" or conduct. *Id.* at 2185. In *Florida v. Jardines*, 569 U.S. at 8-9, the Court rejected the notion that a warrantless dog sniff search at the front door of a home could be upheld on the theory that the officer had an implied invitation or license to approach the front door. Similarly, *Marshall v. Barlow's Inc.*, 436 U.S. 307, 313 (1978), observed that the "owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents." *Birchfield*'s citation to these cases suggests that the Court recognized that the Fourth Amendment limits government's attempt to imply a person's consent.

The central issue in *Birchfield* was whether state implied consent laws could impose criminal penalties upon persons who refused to submit to a blood test. *Birchfield* held that under implied consent laws there was "a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads"—"motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." 136 S. Ct. at 2185-86.

*Birchfield* and many of the state cases cited by the majority concern the parameters for securing consent to a search from a conscious defendant. Under *Birchfield,* implied consent laws permit law enforcement to apply some coercion to secure consent to a blood draw, subject to Fourth Amendment limitations—threatening a suspect with administrative sanctions is permissible, threatening criminal penalties is not. This is consistent with the notion of "consent" under the Fourth Amendment, which "has come to mean that set of circumstances that the law will

tolerate as an exception to the probable cause or warrant requirement." *Ruiz v. State*, 50 So. 3d 1229, 1231 (Fla. 4th DCA 2011).

The majority has read *Birchfield* too broadly. The case concerned a consent obtained from a conscious defendant. It cannot be read beyond its facts to authorize an implied consent from an unconscious suspect.

Although the precise holding of *Birchfield* did not address the extent to which an unconscious defendant has "consented" to a blood test, the reasoning of that case supports the conclusion that the statutorily implied consent of an unconscious defendant under section 316.1932(1)(c) is "not equivalent to Fourth Amendment consent." *Liles*, 191 So. 3d at 486.

Under reams of case law, Fourth Amendment consent is the product of a conscious mind.[4] An unconscious defendant cannot be coerced or intimidated. An unconscious defendant is incapable of "conduct, gestures, or words" that can indicate consent. *State v. Gomez*, 34 So. 3d 245, 247 (Fla. 2d DCA 2010). For an unconscious defendant, if exigent circumstances do not exist, "the police may apply for a warrant if need be." *Birchfield*, 136 S. Ct. at 2185. *Birchfield* leads to the conclusion that because of the significant privacy concerns surrounding blood draws, consent to a blood draw cannot be indirectly implied from the act of driving on Florida roads. The government cannot create a statutory sidestep of the Fourth Amendment to "imply" a consent where actual consent or exigent circumstances do not exist. From an unconscious defendant, blood may be drawn pursuant to a warrant or under the exigent circumstances exception to the warrant requirement. *See, e.g., Goodman v. State*, 229 So. 3d 366, 380-82 (Fla. 4th DCA 2017). Only a conscious defendant may voluntarily *consent* to a blood draw consistent with the Fourth Amendment.

### *Good Faith and the Exclusionary Rule*

I agree with Judge Hanser that the good faith exception to the exclusionary rule applies to this case.

McGraw challenges Judge Hanser's application of the good faith exception. He argues that a reasonable officer in Officer De Santis's

---

[4] Courts analyze the totality of the surrounding circumstances at or near the time of the warrantless search to determine whether a conscious defendant's consent is freely and voluntarily given under the Fourth Amendment. *See, e.g., State v. Ojeda*, 147 So. 3d 53 (Fla. 3d DCA 2014); *Ruiz*, 50 So. 3d at 1231; *State v. Evans*, 9 So. 3d 767 (Fla. 2d DCA 2009).

position should have known that a warrant was necessary to perform the blood draw, absent consent or exigent circumstances, and that implied consent is not the functional equivalent of consent for Fourth Amendment purposes.

"The exclusionary rule is a judicially-created remedy adopted to protect Fourth Amendment rights by deterring illegal searches and seizures." *Liles*, 191 So. 3d at 489 (citing *Davis v. U.S.*, 564 U.S. 229, 236-37 (2011)). "It is intended to deter police misconduct, not to remedy the prior invasion of a defendant's constitutional rights." *Id.* at 489 (citing *Montgomery v. State,* 69 So. 3d 1023, 1033 (Fla. 5th DCA 2011)). Given the purpose of the exclusionary rule, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 919 (1984) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).

In *Leon*, the United States Supreme Court established the good faith exception to the exclusionary rule, holding that improperly secured evidence need not be excluded where officers acted in the "objectively reasonable" belief that their conduct did not violate the Fourth Amendment. 468 U.S. at 918-19. Although the *Leon* test was specifically tailored to search warrants, Courts have extended the good faith exception to situations where an officer conducts a warrantless search under the authority of a statute, but the statute is later found to be unconstitutional. *See Davis*, 564 U.S. at 229; *Illinois v. Krull*, 480 U.S. 340 (1987).

In *Birchfield,* the Court recognized that in a blood draw case, where there is a Fourth Amendment violation but "the search was carried out pursuant to a state statute," it is appropriate to address the good faith exception under *Heien,* 135 S. Ct. at 530. *Birchfield*, 136 S. Ct. at 2186 n.9.

In *Heien,* an officer stopped the defendant's car after observing that one of the car's two rear brake lights was not working. 135 S. Ct. at 534. During a consent search of the vehicle, drugs were recovered, and the defendant was subsequently arrested. *Id.* The defendant moved to suppress the evidence seized from the car, arguing that the stop and search violated the Fourth Amendment. *Id.* at 535. After a hearing, the trial court denied the motion, finding that the faulty brake light had given the officer reasonable suspicion to stop the defendant. *Id.*

On appeal, the North Carolina Court of Appeals reversed, determining that driving with a single working brake light was not illegal under North Carolina law, and therefore the stop violated the Fourth Amendment. *Id.* The state appealed and the North Carolina Supreme Court reversed, finding that the officer who initiated the stop "could have reasonably, even if mistakenly, read the [statute] to require that both brake lights be in good working order." *Id.*

The United States Supreme Court granted certiorari. *Id.* The Court found that because the North Carolina statute at issue was ambiguous as to what was required, it was "objectively reasonable for an officer in [the officer]'s position to think that [the defendant]'s faulty right brake light was a violation of North Carolina law." *Id.* at 540. Accordingly, "because the mistake of law was reasonable, there was reasonable suspicion justifying the stop." *Id.* "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable." *Id.* at 539 (emphasis in original).

### *Applying the Good Faith Exception to the Present Case*

Assuming that the blood draw was unconstitutional, McGraw argues that Officer De Santis did not act in good faith because at the time of the blood draw, *Liles* "recognized that statutory implied consent [is] not equivalent to Fourth Amendment consent." 191 So. 3d at 487. He asserts that, based on *Liles,* an objectively reasonable officer in Officer De Santis's position should have known that he could not rely on implied consent alone to justify a warrantless search.

The "good faith" aspect of this case is controlled by *Heien.* Like the officer in *Heien,* it was reasonable for Officer De Santis to think that his actions were authorized by the plain language of section 316.1932(1)(c). If anything, Officer De Santis's reliance on the statute is more compelling than the officer's reliance in *Heien* because in *Heien,* the statutory language was ambiguous and could be interpreted in multiple ways; in this case, the plain language of the statute was unambiguous and the statute, on its face, plainly authorized the warrantless blood draw here at issue. *Liles* concerned implied consent as applied to a conscious defendant who explicitly refused a blood draw. At the time of McGraw's arrest, no Florida appellate decision considered the Fourth Amendment/implied consent tension as it applied to an unconscious defendant incapable of refusal.

Because the language of section 316.1932(1)(c) is clear and there was no appellate decision calling the statute into question, McGraw's reliance on *Carpenter v. State*, 228 So. 3d 535 (Fla. 2017), is misplaced.

Unlike this case, *Carpenter* involved an officer's reliance on an appellate opinion that was not final. The Florida Supreme Court considered whether the exclusionary rule applied to a warrantless search of a defendant's cell phone incident to arrest based on an officer's reliance on a district court decision[5] which, at the time, was under review by the Supreme Court. 228 So. 3d at 538. Subsequent to the defendant's arrest, the Florida Supreme Court ruled that such searches were unlawful. *Id.* at 537. On this basis, the defendant moved to suppress the evidence found on his cell phone, relying on *Smallwood v. State* (*Smallwood II*), 113 So. 3d 724 (Fla. 2013). *Id.* The Court ultimately held that the good faith exception did not apply to the warrantless search, noting that

> in the *Smallwood I* opinion, the First District certified the precise question to this Court with regard to the new subject of cell phone searches as one of great public importance, thus placing law enforcement officers on actual notice that the case was subject to further consideration *on the face of the opinion.*

*Id.* at 540 (emphasis in original). The Court found that the "certified question . . . only furthers the notion that the officers in [the defendant]'s case should *not* have relied on *Smallwood I* as being the final controlling judicial precedent in this area of constitutional law while the case was certified to this Court for final decision." *Id.* at 541 (emphasis in original). Thus, an officer's reliance on a district court opinion is not objectively reasonable if the case is "not final, well-settled, unequivocal, or clearly established." *Id.* at 540.

Unlike *Carpenter*, no Florida appellate decision squarely addressed the unconscious defendant situation here at issue, making it reasonable for the officer to rely on the statute's plain language. An objectively reasonable officer in Officer De Santis's position would not have known that a warrantless blood draw was not authorized under these circumstances. The Fourth Amendment does not hold officers to the standard of law professors.

For these reasons, I concur in the majority's decision to affirm the ruling of the County Court.

---

[5] *Smallwood v. State* (*Smallwood I*), 61 So. 3d 448 (Fla. 1st DCA 2011).

\* \* \*

*Not final until disposition of timely filed motion for rehearing.*